IN the MATTER OF DISCIPLINARY PROCEEDINGS AGAINST
David J. WINKEL, Attorney at Law.

Supreme Court

*No. 96–3680–D. Filed April 21, 1998.*

(Also reported in 577 N.W.2d 9.)

¶ 1. PER CURIAM. We review the recommendation of the referee that David J. Winkel be publicly reprimanded for professional misconduct in failing to do adequate preparation in the representation of clients and explain their legal matter to them to the extent reasonably necessary for them to make an informed decision in it, failing to competently represent a client in an estate matter, misrepresenting that he had prepared a document, and failing to respond to successor counsel's requests for information and the client's file in that matter, and failing to respond to inquiries from the Board of Attorneys Professional Responsibility (Board) in its investigation into his conduct. Attorney Winkel filed a notice of appeal from the referee's report, but that appeal was dismissed for his failure to file his brief within the time required.

¶ 2. We determine that the public reprimand recommended by the referee is the appropriate discipline to impose on Attorney Winkel for his professional misconduct in these matters. His failure to do the necessary legal work in two client matters caused serious repercussions to those clients, financial and otherwise, and by not responding to the Board's inquiries, he failed to meet his professional obligation to cooperate in the court's exercise of its disciplinary authority over those it licenses to practice law.

¶ 3. Attorney Winkel was admitted to practice law in Wisconsin in 1984 and practices in Neenah. He has not been the subject of a prior attorney disciplinary proceeding. Following an evidentiary hearing, the refe-

ree, Attorney John E. Shannon, Jr., made the following findings of fact and conclusions of law.

¶ 4. Attorney Winkel was retained in November, 1989 by a couple contemplating litigation against the persons from whom they had purchased a remodeling business. The clients had obtained a bank loan to purchase the business and had personally guaranteed the loan. The business was not doing well, and the clients wanted to sell it. Attorney Winkel advised them not to pay any of its outstanding debts and to put as much cash as possible in its accounts at the lending bank in the hope that the bank would release them from personal liability on the loan.

¶ 5. Attorney Winkel was aware that the clients had not been keeping separate and treating as trust funds the deposits they had received on remodeling jobs, as required by law. Those deposits were commingled with other business receipts in the bank accounts that constituted a portion of the collateral securing the bank's loan.

¶ 6. A buyer for the business was located and a closing was scheduled for March 30, 1990, but the buyer withdrew the offer to purchase in part because the sellers informed them that there would be creditors of the business who would not be paid out of the sale proceeds. When Attorney Winkel met with the clients on the day of the scheduled closing and reviewed the accounts payable, he learned that the business' debts were almost $149,000, of which almost $33,000 was owed to several subcontractors. At that time, he discussed with his clients the likelihood that when it learned the sale was not completed, the bank would seize the funds in the business checking account and apply it toward the $75,000 loan outstanding. He and his clients discussed removing the funds from the bank

before that could happen in order that the clients would be in a position to ask the bank to release them from their personal guaranties. They also discussed the fees, approximately $5000, owing to Attorney Winkel's law firm and the possibility of the clients' bankruptcy.

¶ 7. When the clients subsequently told Attorney Winkel they could not continue the business and asked what to do with the bank accounts, totaling approximately $22,000, Attorney Winkel advised them that there were many legal ramifications to the matter, including the possibility of adverse claims of trust fund creditors, but he did not discuss with them how much they had received in deposits for three remodeling projects that remained uncompleted, the disbursements the clients had made on those projects, or the claims of subcontractors that remained to be paid out of the funds that had been received. If Attorney Winkel had obtained that information, he would have learned that between December, 1989 and March 30, 1990, the business received $70,000 from three homeowners for the remodeling projects and that there was approximately $33,000 in subcontractor bills that should have been paid out of those deposits but were not. As a consequence, he did not tell the clients that if they used the $22,000 in the bank accounts for something other than payment of the subcontractor bills, they would risk being charged with felony theft by a contractor.

¶ 8. Following that discussion, the clients paid some tax bills of the business and withdrew approximately $20,000 from the business account in the form of two money orders, one to Attorney Winkel's law firm for $5000 and the other to themselves for the balance. They gave the $5000 to Attorney Winkel's firm and returned the balance to the bank in exchange for its

release of their personal guaranties on the loan. At the same time, Attorney Winkel wrote the business' creditors that the business had surrendered all of its assets to the bank and that it appeared there would not be sufficient funds to satisfy other creditor claims. When several creditors contacted him, he took the position that the business no longer had any assets and that the creditors would not have a claim against the owners personally.

¶ 9. After one of the homeowners who had contracted for remodeling services was unsuccessful in obtaining a refund of the deposit contacted the district attorney, the clients were charged with nine felony counts and four misdemeanor counts of contractor theft for their conversion of trust monies that should have been used to pay the subcontractors on the remodeling jobs. One of the clients pleaded no contest to three misdemeanor counts of contractor theft; the case against the other client was held open and subsequently dismissed. The clients made full restitution of all trust monies they had received.

¶ 10. Based on those facts, the referee concluded that Attorney Winkel's failure to obtain information about the trust funds held by the business before the clients surrendered its assets to the bank constituted a failure to do adequate preparation with respect to his representation of the clients, in violation of SCR 20:1.1.[1] In addition, his failure to inform the clients about the risks of criminal prosecution by their surren-

---

[1] SCR 20:1.1 provides:

**Competence**

A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

der of business assets to the bank and payment of his law firm fees without paying or agreeing to pay the subcontractor bills constituted a failure to explain the matter to the clients to the extent reasonably necessary to permit them to make an informed decision about the best use of the remaining business assets, contrary to SCR 20:1.4(b).[2]

¶ 11. The second matter considered in this proceeding concerned Attorney Winkel's representation of a man, his wife, and their son in estate planning matters, beginning in 1991. Attorney Winkel reviewed the trust agreement the husband had executed that provided that, upon his death, all of his assets would be allocated to his wife's marital share unless she disclaimed all or part of them. Under the terms of the trust, if no disclaimer were made, all of those assets would pass directly to the wife and be included in her estate at her death.

¶ 12. When the husband died February 14, 1992, approximately $600,000 was to be transferred to the wife's marital share and become part of her estate unless her disclaimer were filed by November 14, 1992. Although he continued to provide legal services and advice to the wife and son, including advising that a "waiver" of rights under the husband's will be made in order that his assets be treated as trust assets, Attorney Winkel failed to recognize the significance of the trust's disclaimer requirement and did not perform the necessary analysis to advise the wife of the need for a

---

[2] SCR 20:1.4 provides, in pertinent part:

**Communication**

. . .

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

written disclaimer of her husband's assets. As a result, the estate of the wife, who died May 24, 1993, had a potentially greater tax liability.

¶ 13. During the course of the Board's investigation of this matter, Attorney Winkel stated that he had prepared the necessary disclaimer, but his files did not substantiate that he had done so. The son, who had regularly received copies of correspondence and communication between Attorney Winkel and his parents, was unable to find any indication in his records that his mother had executed a disclaimer.

¶ 14. Following his mother's death, the son retained another attorney to represent him in estate matters. That attorney wrote Attorney Winkel inquiring into the existence of a disclaimer and asking for the clients' estate file. Attorney Winkel did not return his telephone calls and, after that attorney filed a grievance, did not respond to the Board's first letter requesting information. He did not respond timely to a second letter and did not return a telephone call from the district professional responsibility committee investigator assigned to the matter. In explaining his failure to respond to the Board's inquiry, Attorney Winkel asserted that when he received it, he had undergone surgery and had been taking pain medication. In fact, he had had two surgeries more than one year prior to receiving the Board's inquiry and a third surgery not long thereafter.

¶ 15. The referee concluded that in this matter Attorney Winkel's failure to have the wife execute the disclaimer required under the father's trust constituted a failure to provide the legal knowledge, skill, thoroughness and preparation reasonably necessary for competent representation of the clients, in violation of SCR 20:1.1. By misrepresenting that he had pre-

pared the necessary disclaimer and by.misrepresenting the reason for his failure to respond to inquiries from the Board, he engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation, in violation of SCR 20:8.4(c).[3] The referee also concluded that Attorney Winkel's failure to respond to successor counsel's request for estate information necessary for the preparation and filing of estate tax returns constituted a failure to keep a client reasonably informed of the status of a matter and promptly comply with reasonable requests for information, in violation of SCR 20:1.4(a).[4] Finally, by failing to respond to the Board's initial request for information and subsequent contacts from the Board and the district committee investigator, Attorney Winkel failed to cooperate in the investigation of this matter, in violation of SCR 21.03(4)[5] and 22.07(2).[6]

---

[3] SCR 20:8.4 provides, in pertinent part:

**Misconduct**
It is professional misconduct for a lawyer to:

. . .

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

[4] SCR 20:1.4 provides, in pertinent part:

**Communication**
(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

[5] SCR 21.03 provides, in pertinent part:

**General principles.**

. . .

(4) Every attorney shall cooperate with the board and the administrator in the investigation, prosecution and disposition of grievances and complaints filed with or by the board or administrator.

[6] SCR 22.07 provides, in pertinent part:

¶ 16. As discipline for his professional miscon-
duct in these two matters, the referee recommended
that Attorney Winkel be publicly reprimanded. In
addition, he recommended that Attorney Winkel be
required to pay the costs of this proceeding.

¶ 17. We adopt the referee's findings of fact and
conclusions of law and impose the recommended public
reprimand on Attorney Winkel as discipline for his pro-
fessional misconduct established in this proceeding.

¶ 18. IT IS ORDERED that David J. Winkel is pub-
licly reprimanded for professional misconduct.

¶ 19. IT IS FURTHER ORDERED that within 60 days
of the date of this proceeding, David J. Winkel pay to
the Board of Attorneys Professional Responsibility the
costs of this proceeding, provided that if the costs are
not paid within the time specified and absent a show-
ing to the court of his inability to pay the costs within
that time, the license of David J. Winkel to practice law
in Wisconsin shall be suspended until further order of
the court.

**Investigation.**

. . .

(2) During the course of an investigation, the administrator
or a committee may notify the respondent of the subject being
investigated. The respondent shall fully and fairly disclose all facts
and circumstances pertaining to the alleged misconduct or medical
incapacity within 20 days of being served by ordinary mail a
request for response to a grievance. The administrator in his or her
discretion may allow additional time to respond. Failure to provide
information or misrepresentation in a disclosure is misconduct.
The administrator or committee may make a further investigation
before making a recommendation to the board.